## 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

### WEIDEBUSCH v. HARTENSTEIN et al.

Decided April 27, 1878.

1878.
Special Term. On the 24th day of December, 1850, W. made a deed to Z. J., by which he settled upon Z. J. a certain house and lot for the use and benefit of W. and T., his then wife, during their joint lives, and to the survivor of them, and then to the three children of said T. by a former husband, and to such children as might be born to said W. and T. Afterwards T. and Z. J. and one of the children died, and said W. again married; and on the — day of July, 1872, W. filed his bill in chancery against the two surviving children and their husbands, and the widow of Z. J., to have the deed rescinded upon the ground that the scrivener, who was the said Z. J., "*through misapprehension and mistake*," drew up a deed instead of a will, when it was intended and desired to make a will instead of a deed. HELD:

1. To rescind a deed under such circumstances, the proof must be *very strong and clear*, that the scrivener did, through misapprehension and mistake, draw a deed instead of a will.

2. The great lapse of time since the drawing of the deed and before the institution of the suit to rescind it, coupled with the fact that the wife, the scrivener and one of the children had died long before the bringing of the suit, and the second marriage of W., should demand the *strongest proof* of the scrivener's mistake, to justify a court of equity in rescinding the deed.

3. The proof in this case is vague, weak and uncertain, and not sufficient to establish the pretended mistake, and therefore the deed should not be rescinded.

Appeal from and *supersedeas* to a decree of the circuit court of Ohio county, rendered on the 15th day of November, 1873, in a cause in chancery, in which August Weidebusch was the plaintiff, and Herman Hartenstein and others were defendants, granted on the petition of the said Weidebusch.

Hon. Thayer Melvin, Judge of the first judicial cir- cuit, rendered the decree complained of.

The facts of the case sufficiently appear in the opinion of the Court:

*W. W. Arnett,* for appellant.

*Daniel Peck,* for appellees.

MOORE, JUDGE, delivered the opinion of the Court:

This case is presented to us by August Weidebusch, upon an appeal from, and *supersedeas* to a decree ren- dered by the circuit court of Ohio county, November 15, 1873, which declared the equity of the case with the de- fendants, and dismissed the plaintiff's bill.

The plaintiff by his bill, which was filed the first Monday of July, 1872, sought to vacate and annul a certain deed made and entered into between said Weide- busch and one Zachariah Jacob, December 24, 1850, upon the ground that said Jacob, "through misappre- hension and by mistake," drew up a deed instead of a will, when the plaintiff intended and desired to make a will and not a deed. The question, therefore, for our consideration is one of fact.

The bill was sworn to, and was answered by the de- fendants, Herman Hartenstein, Louisa his wife and Roberta Gocke jointly, and the answer was sworn to by them.

Weidebusch alleges that on the 24th day of De- cember, 1850, he "being then almost wholly unac- quainted with the English language and with the

usages in regard to, and modes of entailing real estate in this country, and your orator's then wife, Teresa, and her children, Louise Knipping, now the defendant hereto, Louise Hartenstein, Roberta Knipping, now Roberta Gocke, another defendant hereto, and William Knipping, who is now deceased, being also wholly unacquainted at that time with the English language, went with his said family as it was then constituted to the law office of Zachariah Jacob, Esq., in the city of Wheeling, for the purpose of having your orator's last will and testament drawn up in proper form; *that your orator and his then wife explained to the said Jacob* in the best manner they could, without the intervention of an interpreter, what they desired to have done in the premises; and the understanding between your orator, his then wife and the defendants, Louise Hartenstein, Roberta Gocke, and William Knipping, who is now deceased, was decidedly clear at that time that your orator's will and testament was to have been drawn and that no deed or other paper in the nature or of the effect of a deed, had been or was intended to have been drawn; that your orator and all the said members of his family were German, and were and had been for nearly all their lives prior to the said date used only to hear and to speak the German language, and that the conversations both before they went to the said Jacob's office and while there in regard to the paper which they desired to have drawn up were had between themselves in the German tongue, and that your orator and his family through their inexperience in the English language, and their want of knowledge of the forms of legal instruments, failed to make the said Jacob distinctly understand exactly how *they* desired to have your orator's property disposed of; and that through misapprehension and by mistake the said Z. Jacob drew up a deed of the said date, December 24, 1850, conveying to himself, the said Jacob, a lot of ground, situated in what was then known as Ritchietown, but is now called

the Eighth ward of the city of Wheeling, being lot numbered nine in square numbered sixteen (lot No. 9 in square 16) of that part of the city of Wheeling laid out by Sprigg and Ritchie, in trust for the several uses and purposes in the said deed more fully expressed.

"Your orator further shows unto your honor that from the explanations given by said Jacob at the time of the contents of the said paper to your orator, he believed it provided for such a disposition of your orator's property after his death as your orator then desired; but being at that time wholly unable to read English writing, your orator was unable to inform himself further concerning the effect of said deed, and when he was advised that said paper would dispose of your orator's property in the manner which was desired by all those interested in the same, and that he should sign said paper, your orator did execute the same, under the impression that it was a will, and intending and meaning thereby to execute a will, and not a deed. And further that the said paper so executed was afterwards duly admitted to record in the clerk's office of the County Court of Ohio county; that your orator and the defendants hereto fully believed that the said paper, so prepared, executed and recorded as aforesaid, from the said date up to and within a few months now last past, was your orator's last will and testament, when your orator then, for the first time, discovered the mistake here complained of, and satisfied himself that said paper was not his will."

The bill alleges the death of Teresa, the wife of Wm. Knipping, and Mr. Jacob, the draftsman of the deed.

The defendants, Louise and Roberta, in answer to the bill say, " that at the time of the making of the deed of trust exhibited in this bill, the said Louise was about 17 years old, was a full grown girl, and then lived with the said Z. Jacob for wages, which she regularly paid to the plaintiff, and that the said Roberta was two years older than the said Louise; that so far as these respondents know or believe, none of the children of the said Teresa

were present at the making of the deed of trust. The said Roberta was living at Judge Fry's, in Wheeling; that they understood from the said Weidebusch and the said Teresa, their mother, that the property was to be fixed in such a manner that after the death of their step-father and their mother, and the longest liver of them, the property was to go to the children of the said Teresa, then in life and to be born." They also say, "it is not true that the said Weidebusch could not, when this deed was made, understand and speak the English language, but on the contrary, he could speak and understand it well, and so could the said Louise and Roberta, and besides, from the standing of Mr. Jacob for honesty and integrity, they have no doubt that he read this paper to the said Weidebusch *truly* before he signed the same, and they are informed and believe he put the same on record, which would have been an unheard of proceeding for a will." Again they say, "these defendants have been informed and believe that the said Weidebusch has had the said deed in his possession since the making of the same, and certainly would, before he became the father of a numerous family of children by another wife, learn the true character of the said deed; and they say that this deed was just and proper, and on the best of considerations, and ought to stand notwithstanding the desire of the said Weidebusch to appropriate the same for his new wife and children. They require the said Weidebusch to bring into court the original deed of trust for the use of these defendants."

The answer of the defendant is so responsive to the bill as to the *misapprehsnsion and mistake* of the draftsman of the deed, that the *onus* is thrown upon the plaintiff to make out his case by satisfactory evidence, which "must be strong and clear." *McMahon* v. *Spangler*, 4 Rand. 51; Lord Hardwicke said the proof proper in such a case ought to be the *strongest possible.* In the language of Judge Carr: "The solemn acts of the parties under their hands and seals, are not to be

1878.
Special Term.

Weidebusch
v.
Hartenstein
et al.

blown away by loose and vague conversations."

The plaintiff deposed, that "sometime in the year 1850, the mother of the defendants, who was then my wife—we having no children together—we thought it was necessary to make a will, in case I should die that she should become the owner of the property. So we went to *Mr. Jacob and told him to draw up a will and so he did.* We left that will in his possession, afterwards he told me that I should go to the court house and get that will, I did so. I had that will and filed it with my papers. After my wife died, I examined those papers, and found when I was reading this document that it looked more like a deed; I went to some attorney with it and got it examined there; they told me it was a deed."

To the question: What *were your* instructions to Mr. Jacob, to draw a deed or a will? He answered: "To draw a will." When asked who gave the directions to Mr. Jacob to draw the instrument? Answered: "So much as I can recollect, it was my wife and my step-daughter, Louise Hartenstein; she lived with Mr. Jacob at that time." When asked to state, "what the directions were as given by Louise Hartenstein and your wife to Mr. Jacob on that occasion?" He replied: "*I can't say.*" On cross-examination being asked: "Did *you* hear Louise give Mr. Jacob *any directions* about writing the instrument?" He replied: "*I did not.*" When asked: "Did you hear your then wife give Mr. Jacob *any directions* about writing the instrument?" He replied: "*I did not hear it.*" Asked: "Where did Mr. Jacob write this document?" Answered: "In his own house; he read it to me in South Wheeling." On re-direct-examination, when asked to state if he directed his wife and Louise as to how they should direct Mr. Jacob in drawing this instrument, he answered: "I told my wife that Mr. Jacob was to draw up a will." To the request: "State if *you* ever had any conversation with Mr. Jacob about it *yourself.*" He answered: "*I had not.*"

1878.
Special Term.

Weidebusch
v.
Hartenstein
et al.

The epitome of Mr. Weidebusch's deposition as to the directions given to Mr. Jacob, therefore is, that *he* and his then *wife* told Mr. Jacob to draw up a will; that *his* instructions to Mr. Jacob were to draw up a will; that it was *his wife* and Louise who gave the directions to Mr. Jacob to draw the instrument; what the directions were as given by Louise he could not say; that he did not hear Louise give Mr. Jacob any directions; that he did not hear his wife give Mr. Jacob any directions about writing the instrument; that he told his wife that Mr. Jacob was to draw up a will; that he had no conversation with Mr. Jacob about it; that Mr. Jacob wrote it in his own house, and read it to him in South Wheeling.

The plaintiff alleges that at the time the deed was drawn, he was " *almost wholly unacquainted with the English language,*" and that his then wife, Teresa, and her children, the defendants, Louise and Roberta, &c., were " *wholly unacquainted*" with the *English language;* and that they went to Mr. Jacob to have the will "drawn up," and that he and his wife explained to said Jacob "in the best manner they could, without the intervention of an interpreter, what they desired to have done," &c.; and that "through their inexperience in the *English language,*" &c., "failed to make Mr. Jacob distinctly understand," &c. In his deposition Mr. Weidebusch says: "At that time I could talk *English,* and give answers, but couldn't read and write *English.*" To the question, " Could Louise Hartenstein *talk English* at that time?" he replied, "I believe she could better than I could." To the question, "Could your wife talk English" at that time? he replied, "Not very much." Thus it seems, that with his own lips he contradicts the allegations of his bill.

Again, the deed shows one of the moving considerations for its execution, was, that his step-children had "*assisted*" him in paying for the lot. But the plaintiff alleges, that it is not true, as is stated in the deed, that the step-children assisted him in paying for the prop-

1878.
Special Term.

Weidebusch
v.
Hartenstein
et al.

erty. To the question, "State whether Louise Knipping and Roberta Knipping ever contributed anything to you by labor, money, or otherwise in the purchase of this property ?" Answered, "Not that I know of ; they delivered money to me, but I bought shoes and clothes for them, &c., and I paid part of their fare coming here from New York. " " With whose money was this property bought ?" Answered by him. " With mine own. " On cross-examination, he says : " Roberta, she lived out shortly after she came here ; Louisa did not. We sent her partly to school and kept her partly at home, till we thought she was strong enough to live out ; then afterwards she lived out partly and partly at home ; *I did receive* a part of their money to buy their clothes and shoes, &c. " Then to the ·question, "Did you buy their shoes and clothes ? " Answer. " I made their shoes and my wife bought their clothes. I did not keep any account because they were very young at that time, and made hardly as much as would keep them."

The defendants, on the other hand, allege in their answer " that they went out to work to raise money to assist the said Weidebusch to carry on his business, and with which to purchase property ; that at the time of making the deed of trust exhibited in this bill, the said Louise was about seventeen years old, was a full grown girl, and then lived with the said Z. Jacob for wages, which she regularly paid to the plaintiff; and that the said Roberta was two years older than the said Louise. " " Roberta was living at Judge Fry's in Wheeling. " Louise testified that she was a hired girl at the time the deed was executed, living at Mr. Jacob's, working for wages and that Mr. Weidebusch and her mother received her wages ; that sometimes she gave her wages to her step-father, and sometimes to her mother. To the question, " Who clothed you during that time, " she answered, " I didn't have much clothes ; my mother furnished what I got ; Mr. Weidebusch made my shoes. "

Roberta testified, that at the time the deed was made, she was living at Judge Fry's as a hired girl, working for wages; that when she worked out, Mr. Weidebusch and her mother received her wages; that she did not stay at her sep-father's house any length of time after coming to this country, but *"went to live out;"* that her clothing was furnished by Weidebusch and her mother; that she and her sister gave them their wages, and they bought us our clothes. To the question, "Did you or your sister ever give to your step-father any money to be invested in the property described in the instrument about which this suit is brought?" She answered: "We gave up our wages every four weeks, sometimes to father and sometimes to mother; did this until I was married." Again to the question, "What kind of clothing?" she answered: "We had only calico dresses." Louise in her sworn statement says of the deed. "I didn't see it made; I didn't read it; I didn't hear it read;" that she didn't give any directions to Mr. Jacob, and didn't hear any given.

Roberta in her sworn statement says, that she didn't see, read or hear the paper read. When requested to state what directions she gave Mr. Jacob about writing it, or what directions she heard any other person give him about writing it, replied, "I did not hear anything said about it; I don't know anything about it."

Mr. Good deposed substantially, that he went to Roberta Gocke and told her he understood there was some business dispute between her and her step-father, and that he came to see if he could effect a compromise, &c., and that he asked her whether she knew that the instrument which her step-father had executed was a will or deed; and that "she said that she was present at the time Mr. Jacob wrote it, and that she knew it was a will or language of similar import;" and also, that "Mrs. Gocke said that she was present and spoke to Mr. Jacob about the business of her father, and told him that he desired a will, and explained to him the understanding of both

her father and mother." Mrs. Louise Hartenstein was not present at that interview. That at another time, he went to see Mrs. Hartenstein, as Wiedebusch's lawyer to see if he could settle a dispute between him and her, &c., and that he asked her, " if she was positive as to whether it was a deed or a will, to which she replied that it was a will, that her father and mother had both told her so ; that in that interview Mrs. Gocke was not present."

Mr. Rogers, another lawyer for Weidebusch, deposed substantially, that he went with Mr. Good, and was present at his interview with Mrs. Gocke ; and that his recollection was, that Mrs. Gocke said she was present when Mr. Jacob wrote the paper, or words to that effect. That "she said it was not a deed, it was a will." Again he says, " she spoke of the matter as having been prepared by him, Mr. Jacob, after he had received his instructions from somebody—*whom, she did not state*—as to the intention of Mr. Weidebusch in having the paper drawn."

So it appears that Mr. Good and Mr. Rogers do not tally as to what Mrs. Gocke did say as to the person giving directions to Mr. Jacob, although both were present for the purpose of watching and weighing her answers to Mr. Good's questions, yet whilst Mr. Good says - that Mrs. Gocke said " *she* spoke to Mr. Jacob about the business of her father and told him that he desired a will and explained to him the understanding of ·both her father and mother," Mr. Rogers as appears from the foregoing deposition says, " *whom she didn't state*." Mrs. Gocke says as to the interview with Good, "I didn't say it was a will or a deed ; I said I knew what it was ; that was all I told him." Mrs. Hartenstein does not remember whether she answered Good whether it was a will or deed. If it were possible to look upon whatever was said by Mrs. Gocke or Mrs. Hartenstein when apart, in answer to Mr. Good, seriously with an eye to rescind the solemn deed of Weidebusch, we could only view it as " *loose and vague conver-*

*sations,"* not of sufficient force to prejudice their rights under the deed, and of no effect as against their sworn statements made after mature deliberation. The facts proven do not show that the draftsman labored under misapprehension and made a mistake as to the nature of the instrument intended by Mr. Weidebusch. His intention is clearly shown by the allegations of his bill and by his own deposition to have been to settle the property just as it is done by the deed. And having admitted that he could, at the time the deed was made, talk English and give answers, he certainly must have understood the purport of the deed when Mr. Jacob read it to him in South Wheeling; he must have been satisfied with it as carrying out his intentions then, and it was true that one of the considerations moving him to the making of the deed, was the assistance his step-children had given him in paying for the property. Having induced the mother of the children to dispose of her and her children's property in the Prussian dominion in Europe, and to follow him to this country, to unite with him in life's struggles, it was right that he should provide for their future, as he did, by deed, and they were entitled to his wise consideration in that respect, and were fortunate that the settlement *as then intended,* was made by solemn, staple deed, which should carry out the intention of all parties, instead of a will, that depended for its existence upon the caprice of only one of the parties. Looking at this case in all its bearings, the pleadings and the evidence, I am satisfied that the controlling principle is to give effect to the intention of the parties at the time the instrument was made, just as in the construction of marriage articles, for in my view this instrument is of the nature of marriage articles. If I am correct in that view, then the court was not to be restrained by merely the kind of instrument adopted to settle the property on those intended, nor by "technical rules which prevail in limitations of legal estates and executed trusts," but give a liberal

interpretation so as to support those interests which may fairly be presumed were intended to be secured. It seems positive to me that this case, as presented to the court, shows that the intention of the parties was not merely to provide for the husband and wife during their lives, but to provide also for the particular children designated in the deed of settlement after the death of the step-father and their mother. The evidence surely is not satisfactory, is not of that strength and clearness which would justify a court of equity in rescinding a deed for an alleged mistake of the scrivener, in that he had written a deed instead of a will, through misapprehension of the directions given him as to the instrument intended to be made; and especially after the lapse of twenty-two years from the making of the deed before suit is brought, and after the scrivener and some of the beneficiaries had died, and the surviving beneficiaries, the defendants, were thus deprived of the benefit of their knowledge of the facts of the case.

I am therefore of opinion, that the decree of the circuit court is right, and should be affirmed with costs, and $30.00 damages.

The other Judges concurred.

DECREE AFFIRMED.